IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DARTAVIUS BARNES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 3:20-cv-03265-SEM-TSH |
| | ) | |
| CITY OF SPRINGFIELD, ILLINOIS, a municipal corporation, OFFICER COLTON REDDING, OFFICER BRIAN RIEBLING, OFFICER ADAM WESTLAKE, OFFICER JUAN RESENDEZ, OFFICER NICHOLAS RENFRO, AND OFFICER REGAN MOLOHON, | ) ) ) ) ) ) ) | Honorable Sue E. Myerscough

Magistrate Judge
Karen L. McNaught |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

NOW COMES Plaintiff, DARTAVIUS BARNES, through his attorneys, CLIFFORD LAW OFFICES, P.C., and responds to Defendants' Motion for Summary Judgment as follows:

**INTRODUCTION**

This lawsuit seeks to redress the harm inflicted on Plaintiff Dartavius Barnes ("Barnes") resulting from an illegal search and seizure on April 6, 2020, that desecrated his daughter's ashes. By way of background, on February 11, 2009, Barnes learned that his two-year-old daughter died due to environmental neglect while living with her mother and her mother's boyfriend. Two weeks before the events of April 6, 2020, Barnes had placed his daughter's ashes into a sealed, decorative urn which he carried with him at all times. Subsequently, on April 6, 2020, Barnes was driving his car when he was the victim of a shooting after a bullet struck his car. While rushing from the scene of the shooting, Barnes was arrested by a Springfield Police Department police officer. During this arrest, officers searched Barnes' car and located an urn containing his daughter's ashes. The officers then forced open this urn and conducting chemical tests on Barnes' daughter's ashes. As

1

a result of the officers' acts, Barnes' two-year-old daughter's ashes were destroyed. For the following reasons, Defendants' Motion for Summary Judgment should be denied.

## RESPONSE TO UNDISPUTED MATERIAL FACTS

**Undisputed Material Facts:**

Plaintiff stipulates to Defendants' Undisputed Material Facts Numbers 1 through 55.

**Additional Material Facts:**

1. In February 2019, Barnes was informed about the death of his two-year-old daughter, Ta'Naja Barnes ("Ta'Naja"). *See* Deposition Transcript of Dartavius Barnes attached hereto as Exhibit A, at 41:4-41:17.

2. At the time of this death notification, Officer Colton Redding ("Redding") accompanied a representative from the Macon County coroner's office to notify Barnes. *Id.* at 42:14-42:18.

3. Subsequently, approximately two weeks before the night of April 6, 2020, Barnes placed Ta'Naja's ashes into a decorative urn which was sealed using a solder and epoxy to keep the urn permanently closed. *Id.* at 47:7-49:20; *see* Photograph of Urn attached hereto as Exhibit B.

4. At approximately 8:00 p.m. on April 6, 2020, Barnes was driving his car near the intersection of Laurel Street and Polk Street in Springfield, Illinois when he heard the sound of gunshots and bullets strike his car. Ex. A at 5:17-5:23; 7:11-8:18.

5. Barnes was not an intended target of this shooting but merely in the "wrong place at the wrong time." *Id.* at 9:9:3-9:19.

6. The events and conversations following this traffic stop were recorded on Officer Redding's body-worn camera and stipulated between the parties. *See* Body Worn Camera attached hereto as Exhibit D; *see also* Defendants' Brief at p. 2. Plaintiff adopts and incorporates the entirety of Exhibit D herein.

7. Immediately upon making contact with Barnes, Redding said to Barnes, "Someone shooting at you?" and Barnes replied, "Yeah." *Id.* at 1:02-1:05.

8. Barnes then stated, "I don't know if they hit my car." *Id.* at 1:12-1:15.

9. Redding then asked Barnes, "Who was shooting at you?" to which Barnes said, "I don't know who [] it was." *Id.* at 1:23-1:26.

10. Redding initially received a dispatch that an alleged witness identified as "Dartavius Anderson" as the person firing shots. *Id.* at 3:06.

11. Redding asked Barnes to "hop out" of the car, and as Barnes cooperated and exited his car, Barnes stated, "I don't got no gun in here." *Id.* at 3:06-3:11.

12. Upon Barnes exiting his car, Redding immediately placed Barnes' hands behind his back and applied handcuffs. Barnes then informed Redding, "I wasn't shooting." *Id.* at 3:12-3:22.

13. Redding told Barnes he was "just being detained right now. All right, man. Until we sort it out." *Id.* at 3:22-3:24.

14. Redding asked Barnes, "Got anything in your car," and Barnes replied something inaudible including the word "weed." *Id.* at 3:24-3:27.

15. As Barnes uttered the word "weed," Officer Brian Riebeling ("Riebeling") interjected to ask, "No problem if we search?" and, while his hands were handcuffed behind his back, Barnes replied, "Yeah, go ahead." *Id.* at 3:27-3:29; Ex. C at 68:2-68:24.

16. Barnes testified that he believed the officers were asking to search for weapons inside his car. Ex. A, at 39:12-40:4.

17. Barnes never consented to the officers looking inside his daughter's urn. *Id.* at 40:5-40:9.

18. Barnes was then placed in the rear of a squad car on scene where he was told, "You are not being arrested. You are just being detained." Ex. D at 4:50-4:52.

3

19. As officers inspected the exterior and trunk of Barnes' car, they observed a bullet hole consistent with Barnes' earlier statement of being the victim of a shooting. *Id.* at 5:00-5:11.

20. Before conducting any search of the interior of the car, Redding identified the bullet hole on the rear passenger area of the car and reported to the other officers on scene that "he's got a bullet hole right here, it looks like." *Id.* at 5:11-5:31.

21. While officers remained outside of Barnes' car prior to conducting any interior search of the car, reports over the radio stated that "we are not getting much cooperation out here" referring to the shooting investigation. *Id.* at 6:22-6:25.

22. Redding proceeded to canvass the area on foot looking for any weapons that Barnes could have thrown from his car prior to stopping the car; however, Redding did not locate any such weapons. *Id.* at 9:50-17:36.

23. While walking the area searching for evidence, Redding was speaking to another officer on the phone and stated, "Somebody's lying because he does have a bullet hole in his car. And I feel like Dartavius, if he had a gun, I don't think he would pull over or even toss it, he would just dip." *Id.* at 11:15-11:28.

24. Redding further opined that he did not think Dartavius fired a gun where he told another officer while canvassing the area for the gun, "I don't know, I mean, he's got like a couple things of weed, but at least a couple ounces in the car. I feel like he would toss those too with the gun but I don't know." *Id.* at 12:00-12:31.

25. As Redding returned back to the scene where Barnes and his car were located, Redding told other officers, "I was just checking to see if he threw anything...I did not see him throw anything though." *Id.* at 17:23-17:36.

26. While Redding was canvassing the area, Riebeling searched Barnes' car where he located Ta'Naja's urn. Ex. C at 91:1-91:18.

4

27. Riebeling assisted Redding in the investigation of the shooting and the traffic stop of Barnes. *See* Deposition Transcript of Brian Riebeling attached hereto as Exhibit E, at 22:16-29:12.

28. Prior to searching, Riebeling asked for consent to search from Barnes who was handcuffed at the time without explaining that Riebeling was going to search any closed containers inside the car. *Id.* at 45:17-46:7.

29. When Riebeling located Ta'Naja's urn, he accessed the sealed urn where he opened the cap without asking for consent from Barnes. *Id.* at 61:23-62:19.

30. Riebeling believed that when he opened Ta'Naja's urn, the police had probable cause to search the vehicle because cannabis was located inside. *Id.* at 74:13-75:7.

31. Riebeling never attempted to obtain a warrant to search Barnes' car or Ta'Naja's urn because, although possession of cannabis was fully legalized in Illinois three months earlier on January 1, 2020, Riebeling believed that the presence of cannabis provided probable cause to search the vehicle and its contents. *Id.* at 43:16-44:5; 75:8-75:18; and 80:22-81:2.

32. On scene after Redding canvassed the area for any weapons, Redding to Barnes' father that the police will not perform a gunshot residue test on Barnes to identify or exclude the presence of gunshot residue. Ex. C at 19:48.

33. While Barnes was handcuffed in the back of a Springfield Police Department squad car, Redding approached the car and opened to door where the following conversation took place between Redding and Barnes:

> Redding: Do you care if we process that car because you do have a bullet hole on it?
> Barnes: Can I see it?
> Redding: Yeah, but do you care though. I'll show it to you.
> Barnes: What do you mean process it?
> Redding: What?
> Barnes: What do you mean process it?
> Redding: Like we will take pictures and see if we can find a bullet – projectile in it.

5

Barnes: I mean, yeah, go ahead, bro.

*Id.* at 22:50-23:10.

34. Barnes then asked Redding if he can get out of the handcuffs, but after Redding agreed and retrieved his keys to unlock the handcuffs, Riebeling had Redding put Barnes back in the squad car in handcuffs. *Id.* at 23:30.

35. Riebeling then relocated with Redding a few feet from Redding's squad car where Riebeling then displayed the urn which Riebeling obtained from the center console of Barnes' car. *Id.* at 23:31-23:51.

36. Riebeling again open the urn containing Barnes' daughter's ashes and stated, "At first, I thought it was heroin. Then I checked for cocaine. But it looks like it's probably Molly (Ecstasy)." *Id.* at 23:51-24:06.

37. When Redding informed Barnes that he was going to be charged with possession of cannabis and ecstasy, Barnes appeared doubtful and asked for an explanation. *Id.* at 27:06-27:38.

38. Redding then read Barnes his Miranda rights approximately thirty minutes after first stopping Barnes due to the possession of the alleged "ecstasy" and "plus the weed [because] it's too much." *Id.* at 29:01-29:39.

39. When Redding showed Barnes the container with the alleged "ecstasy," Barnes immediately cried out, "No. No. No, bro. That's my daughter. What are you all doing?" *Id.* at 29:45-29:53.

40. Redding and other officers spoke about Barnes' clearly distraught and emotional response, and after recognizing the substance in the item was in fact Barnes' daughters' ashes, gave the urn with ashes to Barnes' father, who was still on scene. *Id.* at 29:53-33:39.

41.	Redding released Barnes on scene with a notice to appear at court on the cannabis charges without charging Barnes for any involvement in the shooting. *Id.* at 35:40-35:48.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court "draws all reasonable inferences from the evidence in the light most favorable to the nonmoving party." *Williamson v. Ind. Univ.,* 345 F.3d 459, 462 (7th Cir. 2003). "Summary judgment is appropriate when there is no genuine dispute as to a material fact." *Estate of Jones v. Children's Hosp. & Health Sys. Inc. Pension Plan*, 892 F.3d 919, 923 (7th Cir. 2018). "At the outset we note that summary judgment is to be applied with caution." *Peoples Outfitting Co. v. Gen. Elec. Credit Corp.*, 549 F.2d 42, 45 (7th Cir. 1977), citing *International Association of M. & A. W. Dist. No. 8 v. Clark Company*, 471 F.2d 694, 697 (7th Cir. 1972). "Further, the granting of summary judgment, while a drastic remedy, is a wholesome one where applicable to the circumstances, and is never warranted except on a clear showing that no genuine issue as to any material fact remains for trial." *Mintz v. Mathers Fund, Inc.*, 463 F.2d 495, 498 (7th Cir. 1972).

## ARGUMENT

**I.	Riebeling and Redding unlawfully arrested Barnes and searched Barnes's car and Ta'Naja's urn.**

**A.	Barnes was unlawfully arrested.**

Redding and Riebeling illegally arrested Barnes on April 6, 2020. The threshold question in this matter is whether Redding and Riebeling had probable cause to arrest Barnes at the time they sought consent to search Barnes' car.

7

When Redding had Barnes exit the car and handcuffed Barnes, this seizure constituted more than a minimal intrusion upon Barnes' freedom as asserted by Defendants on page 10 of their brief; but rather, Redding's conduct toward Barnes constituted an arrest without probable cause.[1] The Fourth Amendment to the United States Constitution generally protects citizens against unreasonable seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6; *People v. Sorenson*, 196 Ill. 2d 425, 432 (2001). "A seizure occurs when the police, by means of physical force or show of authority, have in some way restrained the person's liberty." *People v. Perkins*, 338 Ill.App.3d 662, 666 (2003). A vehicle stop implicates the Fourth Amendment because stopping a vehicle and detaining its occupants constitutes a "seizure" within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996).

It is axiomatic that a seizure must be supported by probable cause. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6; *Sorenson,* 196 Ill.2d at 432. However, a limited exception to the probable cause requirement for a seizure was recognized by the United States Supreme Court in *Terry v. Ohio,* 392 U.S. 1, 22 (1968). Pursuant to *Terry,* a police officer may, under appropriate circumstances, briefly detain a person for investigatory purposes if the officer reasonably believes that the person has committed, or is about to commit, a crime. *Id.* The United States Supreme Court has further determined that a vehicle stop is analogous to a *Terry* stop and, as a result, is generally analyzed under *Terry* principles. *Knowles v. Iowa*, 525 U.S. 113, 117, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998). To justify a *Terry* stop, a police officer may detain a person without having probable cause to arrest; however, the officer must have a reasonable, articulable suspicion that the person detained has committed or is about to commit a crime. *Terry*, 392 U.S. at 21-22. "'[T]here is no

---

[1] Pursuant to Federal Rule of Civil Procedure 41(a), Plaintiff hereby stipulates to dismiss his claims against Officer Adam Westlake, Officer Juan Resendez, Officer Nicholas Renfro, and Officer Regan Molohon.

bright-line test for distinguishing between a lawful *Terry* stop and an illegal arrest.'" *People v. Arnold*, 394 Ill.App.3d 63, 70 (2009), quoting *United States v. Glenna*, 878 F.2d 967, 971 (7th Cir. 1989). "[A] restriction of movement that is brief may amount to an arrest rather than a *Terry* stop if it is accompanied by use of force usually associated with an arrest, unless such use of force was reasonable in light of the circumstances surrounding the stop." *People v. Johnson*, 408 Ill.App.3d 107, 113 (2010).

The use of handcuffs may convert a *Terry* stop into an arrest "because it heightens the degree of intrusion and is not generally part of a stop." *Id.* "Handcuffs are generally recognized as a hallmark of a formal arrest." *United States v. Newton,* 369 F.3d 659, 676 (2d Cir. 2004)(collecting cases). When "arrest-like measures" such as handcuffing are employed, "they must be 'reasonable in light of the circumstances that prompted the stop or that developed during its course.'" *People v. Nitz*, 371 Ill.App.3d 747, 754 (2007), quoting 4 Wayne R. LaFave, Search & Seizure § 9.2(d), at 304 (4th ed. 2004), quoting *United States v. Acosta-Colon,* 157 F.3d 9, 15 (1st Cir. 1998)). "If the use of such restraints is not reasonably necessary for safety under the specific facts of the case, their use will indicate that the encounter should be viewed as an arrest." *People v. Arnold*, 394 Ill.App.3d at 63, 71 (2009).

After Redding pulled over Barnes, Redding knew that Barnes was the victim of the shooting that night when Redding stated, "Someone shooting at you?" and Barnes stated "Yeah" and "I don't know if they hit my car." Ex. D at 1:05-1:15. Redding then asked Barnes, "Who was shooting at you?" to which Barnes said, "I don't know who [] it was." *Id.* Redding stated that he never saw Barnes in possession of a firearm or throw the firearm when being pulled over. Redding acknowledged that Barnes was cooperative in pulling over. Nevertheless, despite clear evidence that Barnes was the victim of a shooting including physical evidence showing a bullet hole in Barnes' car, Redding proceeded to have Barnes exit his car, placed Barnes in handcuffs, and then

placed Barnes into Redding's squad car. At this point, Redding and Riebeling arrested Barnes without probable cause.

### B.      Barnes did not lawfully consent to the search of Ta'Naja's urn.

Because Barnes' consent was obtained as the result of an unlawful arrest, Barnes' purported consent is void. "[C]onsent is vitiated if it was the product of an unlawful seizure." *McGann v. Ne. Illinois Reg'l Commuter R.R. Corp.*, 8 F.3d 1174, 1184 (7th Cir. 1993). "Consent obtained after an illegal seizure is invalid unless it can be shown that the consent was in fact 'sufficiently an act of free will to purge the primary taint' of the unlawful seizure." *Id.*, citing *Wong Sun v. United States,* 371 U.S. 471, 486 (1963) and *United States v. Recalde,* 761 F.2d 1448, 1457-58 (10th Cir.1985). The purported consent is free of the unlawful taint if there is a break in the causal connection between the illegality and the consent given. *McGann*, 8 F.3d at 1184 (citations omitted). When statements and conduct evidencing consent to a search are given contemporaneously with the illegal seizure, with no break in the causal chain, the actions of the person seized are not free from the taint of unlawful detention and are thus insufficient to show consent. *Id.* (collecting cases).

As stated *supra*, Redding and Riebeling unlawfully arrested Barnes, and because Barnes was unlawfully arrested without probable cause, Barnes' alleged consent to search his car was the fruit of an invalid arrest. Consequently, Redding's and Riebeling's subsequent warrantless search of Barnes' car and Ta'Naja's urn was unlawful.

### C.      The search of Ta'Naja's urn was unreasonable.

Assuming *arguendo* that Barnes' provided a lawful consent to search (Barnes did not), Defendants' search of Ta'Naja's urn under the circumstances was unreasonable. "A consensual search is manifestly reasonable so long as it remains within the scope of the consent." *United States v. Martinez,* 949 F.2d 1117, 1119 (11th Cir. 1992), citing *Florida v. Jimeno*, 500 U.S. 248, 249

10

(1991). "[T]he scope of a consent search is limited by the breadth of actual consent[,]" and "[w]hether the search remained within the boundaries of the consent is a question of fact to be determined from the totality of all the circumstances." *United States v. Torres*, 32 F.3d 225, 230-31 (7th Cir. 1994), quoting *United States v. Garcia*, 897 F.2d 1413, 1419 (7th Cir. 1990) and *United States v. Espinosa*, 782 F.2d 888, 892 (10th Cir. 1986). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness -- what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251. The scope of a warrantless search of an automobile is defined by the object of the search and the places in which there is probable cause to believe that it may be found. *United States v. Ross*, 456 U.S. 798, 824 (1982).

The "general permission to search does not include permission to inflict intentional damage to the places or things to be searched." *United States v. Martinez*, 949 F.2d 1117, 1119 (11th Cir. 1992); *see also Jimeno*, 500 U.S. at 251 ("[i]t is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk"). Police who have obtained a consent to search may open locked containers provided that the container to be opened is capable of holding the object of the search and that the opening of the container does not involve the unnecessary infliction of damage. *United States v. Strickland*, 902 F.2d 937 (11th Cir. 1990)(defendant's consent to search automobile did not reasonably include consent to slash open spare tire). A vehicle search reasonable in scope may nevertheless be unreasonable if it is conducted in an unreasonable manner. *United States v. Ramirez*, 523 U.S. 65, 71 (1998); *Heft v. Moore,* 351 F.3d 278, 282 (7th Cir. 2003). For example, "[e]xcessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment." *Ramirez*, 523 U.S. at 71.

In this case, Barnes was the victim of a shooting when he was stopped by Redding and Riebeling. While Redding attempted to determine Barnes' role in this shooting, Redding and Riebeling removed Barnes from his car. When Redding and Riebeling asked Barnes to search his car, Barnes would not reasonably expect the officers would search his daughter's sealed urn located inside his console; instead, Barnes believed the officers were looking for weapons related to the shooting at issue. Ex. A, at 39:12-40:4. Moreover, Redding's and Riebeling's search of Ta'Naja's urn was unreasonable for officers to cause damage to the urn where they necessarily broke the soldered-sealed cap of the urn in order to access Ta'Naja's ashes. Ex. A, at 46:24-49:20.

## II. Defendants are not entitled to Qualified Immunity.

Defendants Redding and Riebeling are not entitled to qualified immunity because it is well-settled that unreasonable searches and seizures are unlawful. The doctrine of qualified immunity shields from liability public officials who perform discretionary duties, *Belcher v. Norton*, 497 F.3d 742, 749 (7th Cir.2007), and it thus protects police officers "who act in ways they reasonably believe to be lawful." *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). The defense provides "ample room for mistaken judgments" and protects all but the "plainly incompetent [or] those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991), quoting *Malley v. Briggs,* 475 U.S. 335, 343 (1986); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996). Qualified immunity protects those officers who make a reasonable error in determining whether there is probable cause to arrest an individual. *Anderson*, 483 U.S. at 643; *Belcher v. Norton,* 497 F.3d 742, 749 (7th Cir. 2007). Whether police officers had probable cause to arrest a suspect and whether they are entitled to qualified immunity for the arrest are closely related questions, although qualified immunity provides the officers with an "additional layer of protection against civil liability" if a reviewing court finds that they did not have probable cause. *Hughes v. Meyer*, 880 F.2d 967, 970 (7th Cir. 1989).

In an unlawful arrest case in which the defendants raise qualified immunity as a defense, this court will "determine if the officer actually had probable cause or, if there was no probable cause, whether a reasonable officer could have mistakenly believed that probable cause existed." *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998). If the officers can establish that they had "arguable probable cause" to arrest the plaintiff, then the officers are entitled to qualified immunity, even if a court later determines that they did not actually have probable cause. *Id.* Accordingly, summary judgment is proper only where "a reasonable police officer in the same circumstances and with the same knowledge ... as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." *Id.*

In this case, it was clearly established that Redding and Riebeling must have probable cause to arrest, that a consent elicited from an unlawful arrest is invalid, and that destruction of property is unreasonable. *See Maldonado v. Pierri*, 08 C 1954, 2010 WL 431478, at *8 (Feb. 1, 2010)(court denied qualified immunity to officers for causing damage to car during vehicle search). Consequently, Redding and Riebeling are not entitled to qualified immunity in this matter.

**III.    Barnes is entitled to trial on his state law claims.**

Initially, Barnes is entitled to trial on his False Imprisonment claim in Count IV because Defendants waived summary judgment on Count IV. *Lee v. Chicago Youth Centers*, 69 F. Supp. 3d 885, 888 (N.D. Ill. 2014). Moreover, Defendants' motion for summary judgment on Count V for Intentional Infliction of Emotional Distress ("IIED") and Count VI for Negligent Infliction of Emotional Distress ("NIED") should be denied.

**A.    Intentional Infliction of Emotional Distress.**

Under Illinois law, a plaintiff may recover damages for intentional infliction of emotional distress if he establishes that: "(1) the defendant's conduct was extreme and outrageous, (2) the defendant intended to inflict severe emotional distress or knew that there was at least a high

probability that his conduct would inflict severe emotional distress, and (3) the defendant's conduct did cause severe emotional distress." *Van Stan v. Fancy Colours & Co.,* 125 F.3d 563, 567 (7th Cir. 1997). "[T]he determination of whether words or conduct are actionable is made on an objective rather than subjective standard." *Knieriem v. Izzo*, 22 Ill. 2d 73, 86 (1961). "The unwarranted intrusion must be calculated to cause 'sever emotional distress' to a person of ordinary sensibilities, in the absence of special knowledge or notice." *Id.* A cause of action for intentional infliction of emotional distress must be premised on conduct that is so extreme and outrageous that it goes beyond all possible bounds of decency. *Rekosh v. Parks*, 316 Ill. App. 3d 58 (2000). In determining whether conduct is extreme and outrageous, the relationship between the parties must be considered, especially when one of the parties has actual or apparent power or authority over the other party. *Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 90 (1976). Other factors to be considered are whether the defendant reasonably believed that his objectives were legitimate and the defendant's awareness that the plaintiff was particularly susceptible to emotional distress. *Graham v. Commonwealth Edison Co.*, 318 Ill. App. 3d 736 (2000).

A defendant recklessly or consciously disregards the probability of causing emotional distress if he or she is certain, or is substantially certain, that his or her conduct will cause emotional distress. *Public Finance*, 66 Ill. 2d at 90. The distress inflicted must be "so severe that no reasonable person could be expected to endure it." *Id.* "The intensity and duration of the emotional distress are factors to be considered in determining its severity." *Id.* While courts often look for physical manifestations of the emotional distress, neither physical injury nor the need for medical treatment is a necessary prerequisite to establishing severe emotional distress. *Honaker v. Smith*, 256 F.3d 477 (7th Cir. 2000). The extreme and outrageous character of the defendant's conduct is in itself important evidence to show distress because Illinois courts merge the outrageousness of the defendant's conduct with the severity of the plaintiff's emotional distress. *Id.*

Here, Redding and Riebeling opened Barnes' daughter's ashes and performed chemical tests. Once Barnes learned of the desecration of his daughter's ashes, it is undeniable that Barnes experienced severe emotional distress. Assuming the evidence in the light most favorable to Barnes, a triable issue exists as to whether the defendants' conduct constituted extreme and outrageous conduct.

**B.  Negligent Infliction of Emotional Distress**

To state a claim for negligent infliction of emotional distress ("NIED"), a plaintiff must show that "(1) defendant owed plaintiff a duty; (2) defendant breached that duty; and (3) plaintiff's injury was proximately caused by that breach." *Howell v. Jofe,* 483 F.Supp.2d 659, 667 (N.D. Ill. 2007), citing *Parks v. Kownacki,* 193 Ill. 2d 164 (2000).

Defendants moved for summary judgment on the NIED claim because Defendants allege that Barnes did not suffer a physical injury. On the contrary, because Barnes was a direct victim of Defendants' conduct, no physical injury is necessary. In *Corgan v. Muehling*, 143 Ill. 2d 296, 312 (1991), the Illinois Supreme Court held that a plaintiff need not allege a physical injury in a claim of negligent infliction of emotional distress. *Id.*, citing *Knierim v. Izzo*, 22 Ill.2d 73 (1961)(plaintiff need not allege physical injury to recover for intentional infliction of emotional distress). Moreover, a reasonable jury could determine that Barnes suffered a physical injury while Barnes was handcuffed and thereafter arrested without probable cause. Thus, Barnes is entitled to a trial on his NIED claim as well.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied.

    Respectfully submitted,

    /s/ James C. Pullos
    James C. Pullos

James C. Pullos
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle St., Suite 3600
Chicago, IL 60602
(312) 899-9090
jcp@cliffordlaw.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I, James C. Pullos, an attorney, hereby certify that on January 20, 2023, I served **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** via this Court's CM/EFC system.

By: /s/ James C. Pullos
James C. Pullos
