IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| DARTAVIUS BARNES ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 20-cv-3265 |
| ) | |
| CITY OF SPRINGFIELD, COLTON ) | |
| REDDING, BRIAN REIBLING, ) | |
| ADAM WESTLAKE, JUAN ) | |
| RESENDEZ, NICHOLAS RENFRO, ) | |
| and REGAN MOLOHON, ) | |
| ) | |
| Defendants. ) | |

## OPINION

**COLLEEN R. LAWLESS, U.S. District Judge:**

Before the Court is Defendants' Motion for Summary Judgment (Doc. 26).

### I.   PROCEDURAL BACKGROUND

On October 6, 2020, Dartavius Barnes filed an eight-count Complaint against Defendants. (Doc. 1). Counts I through III were brought pursuant to 42 U.S.C. § 1983 and allege various violations of Barnes's Fourth Amendment constitutional rights. (*Id.* at 5-7). Counts IV through VI allege violations of Illinois state law, including false imprisonment, intentional infliction of emotional distress, and negligent infliction of emotional distress. (*Id.* at 7-9). Count VII is an action for indemnity against the City. (*Id.* at 9-10).

On December 21, 2022, Defendants filed their Motion for Summary Judgment arguing that the officers did not violate Barnes' constitutional rights and that they are

entitled to qualified immunity. (Doc. 26). On January 20, 2023, Barnes filed his response (Doc. 27), and Defendants filed their reply (Doc. 28) on February 3, 2023.

## II. UNDISPUTED FACTS[1]

On April 6, 2020, Barnes was driving a blue Chrysler 300 in Springfield when he heard gunshots. (Doc. 26 at ¶4). Upon hearing the shots, he drove away and did not stop at a stop sign. (*Id.* at ¶5). Officer Redding was responding to the gunshots when he observed Barnes disobey the stop sign while driving at a high rate of speed away from where he believed the gunshots had occurred. (*Id.* at ¶¶6-8). Officer Redding initiated a traffic stop based on Barnes' traffic violation and his possible connection to the gunshots. (*Id.* at ¶8). Radio dispatch informed Redding that a black Chrysler 300 was seen leaving the area of the gunshots and that an individual named "Dartavious Anderson" was involved in the shooting. (*Id.* at ¶¶ 10-11). Redding believed the radio reports were referring to the blue Chrysler 300 he pulled over and the Plaintiff, Dartavious Barnes. (*Id.* at ¶11). Shortly thereafter, dispatch corrected Dartavious' surname from Anderson to Barnes. (*Id.* at ¶12). During the traffic stop, Barnes told Redding that he had been shot at by an unknown individual. (Redding BWC, Ex. D at 1:02-26). Based on the foregoing, Officer Redding opened the door to Barnes's car, asked Barnes to exit, and handcuffed Barnes for further investigation of the shots fired incident. (Doc. 26 at ¶16; Ex. D, Redding Body Worn Camera at 3:09-17).

---

[1] Unless otherwise noted, the factual background of this case is drawn from Defendants' statement of undisputed material facts; Barnes's response to Defendants' statement of undisputed material facts and additional material facts; Defendants' reply to Barnes's additional material facts; and exhibits to the filings. Exhibit citations are used for facts that the Court finds are undisputed from the summary judgment record.

Soon after, Officer Riebling arrived at the scene and asked Barnes: "you got no problem if I search?" (Doc. 26 at ¶ 18; Ex. D at 3:25). Barnes consented and told the officers he had "weed" in the car. (Doc. 26 at ¶ 19). As Riebling was searching the car, Redding escorted Barnes to his squad car and began searching him. (Doc. 26 at ¶ 20; Ex. D at 3:37). The officers saw a bullet hole on the rear, right side of Barnes's car, and Riebling observed it "seems new." (Doc. 26 at ¶ 21; Ex. D at 5:10). As Barnes was placed in the rear of the squad car, he was told, "You are not being arrested. You are just being detained." (Doc. 27 at ¶18)

While Redding was canvassing the area, Riebling searched Barnes's vehicle and found: (1) three containers of suspected cannabis weighing 79.6 grams, exceeding the possession amount allowed for personal use and not in proper packaging for transporting for personal use; (2) plastic baggies in the glove compartment; and (3) a digital scale. (Doc. 26 at ¶¶ 22-24). Based on his training and experience, Redding noted the amount of cannabis, along with a scale and plastic baggies, were evidence of an intent to illegally sell the cannabis at street level. (*Id*. at ¶25). He also found a small brass container in the center console of Barnes's car that did not contain any markings to indicate it was an urn for human remains. (*Id*. at ¶¶ 26-28). Specifically, the container had a keyring for a necklace and depicted a cross surrounded by dragons and a crown over the cross. (Ex. A at 38-39).



A picture of the urn found by Officer Riebling. (Doc. 26, Ex. H).

Riebling thought it looked like small containers he had seen before that were used for transporting narcotics, so he unsealed the container and found a "brown chunky substance," which he believed was heroin. (Doc. 26 at ¶¶ 29-31). Riebling field tested the substance for heroin and cocaine, but those tests came back negative. (*Id.* at ¶ 31). He then tested the substance for MDMA, ecstasy, and methamphetamines, and the test indicated the presence of one of those substances. (*Id.* ¶ 32). Riebling told Redding, "At first, I thought it was heroin. Then I checked for cocaine. But it looks like it's probably Molly." (Doc. 27 at ¶ 36). Redding informed Barnes that the officers found a substance which tested positive for MDMA, ecstasy, molly, and/or methamphetamine and read him his

*Miranda* rights. (Doc. 26 at ¶¶42-43). Barnes informed the officer that the only substance in the car was cannabis, and Redding offered to show him the other substance. (Ex. D at 28:28-35).

When Redding showed Barnes the container, Barnes became distraught and said "no, no, no, bro, that's my daughter! What are you all doing?" and then repeatedly stated, "That's my daughter!" (Doc. 27 at ¶ 39; Ex. D at 29:48-52). Barnes shouted that the officers were "disrespectful" and asked again to see his daughter, but Redding closed the door to the squad car. (Ex. D at 30:10-25). Redding told another officer that Barnes claimed the container contained his daughter's ashes, and the officer asked whether he tested it. (*Id.* at 30:25-32). When Redding opened the trunk of the squad car to get another testing kit, Barnes could be heard pleading for Redding to return his daughter to him and explaining that she was very important to him. (*Id.* at 30:39-57). Another officer told Redding that Barnes's father, who was present at the scene, also stated the urn contained Ta'Naja's ashes. (*Id.* at 31:20-28). Redding gave the urn to Barnes's father, released Barnes from the handcuffs, and told him that he would not be arrested. (Doc. 26 at ¶ 46).

Barnes noted although the urn was previously full, only a quarter inch of his daughter's ashes remained in it. (Dep. of Barnes, Ex. A. at 29-30). Barnes had previously sealed the urn with superglue, which would have made it difficult to open. (*Id.* at 42).

## III.     LEGAL STANDARD

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable trier of fact could

find in favor of the nonmoving party. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A factual dispute is only material if its resolution might change the suit's outcome under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court must construe facts in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Woodruff v. Mason*, 542 F.3d 545, 550 (7th Cir. 2008). "At summary judgment, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 664 (7th Cir. 2006) (internal quotations omitted).

The movant bears the initial responsibility of informing the court of the basis for the motion and identifying the evidence the movant believes demonstrates the absence of any genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party does so, the non-moving party must then go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255 (quotation and footnotes omitted).

### IV. ANALYSIS

#### A. Officers Westlake, Resendez, Renfro, and Molohon

Both parties agree that the claims against Officers Westlake, Resendez, Renfro, and Molohon should be dismissed. Therefore, the claims against those officers are dismissed.

### B. Section 1983 Claims and Qualified Immunity

Section 1983 holds government defendants liable where defendants "subjected or caused to be subjected, any citizen ... or other person ... to the deprivation of any rights" guaranteed by federal law. 42 U.S.C. § 1983. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). Qualified immunity balances two important interests: the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson*, 555 U.S. at 231. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (citing *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

Because qualified immunity is an immunity from suit, rather than a mere defense, the court should resolve immunity questions "at the earliest possible stage in litigation." *Pearson*, 555 U.S. at 231-32. To determine whether qualified immunity applies, courts consider two questions: whether the defendants' actions violate the plaintiff's constitutional rights, and whether the complained-of constitutional violation is "clearly established," such that a reasonable officer would have known his conduct was unlawful. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the

situation." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). If a reasonable officer would not have been aware of the clearly unlawful nature of their actions, qualified immunity applies, and summary judgment is appropriate. *Saucier*, 533 U.S. at 202.

### 1. Seizure

Barnes contends that Officers Redding and Riebling violated his constitutional right to be free from unreasonable seizures. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. The Fourth Amendment does not forbid all, or even most, seizures—only unreasonable ones. *Torres v. Madrid*, 592 U.S. ___, 141 S. Ct. 989, 1003 (2021). Barnes argues Redding unlawfully seized him when he handcuffed him. Defendants argue handcuffing Barnes was reasonable because Officer Redding did not know whether Barnes was a victim or perpetrator of the shooting.

The first issue is whether Officer Redding's detention of Barnes constitutes a *Terry* stop or an arrest. If the detention constituted only a *Terry* stop, the Fourth Amendment requires the lower standard of reasonable suspicion. *United States v. Kirksey*, 485 F.3d 955, 957–58 (7th Cir. 2007); *see also Terry v. Ohio*, 392 U.S. 1 (1968). If Barnes was arrested, then the Fourth Amendment requires the presence of probable cause. *United States v. Adamson*, 441 F.3d 513, 519–20 (7th Cir. 2006).

A *Terry* stop is "a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity." *United States v. Smith*, 3 F.3d 1088, 1095 (7th Cir. 1993). When a seizure exceeds

the bounds of an investigative stop, it becomes an arrest. *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994) (citing *Florida v. Royer*, 460 U.S. 491, 506 (1983)). The line between a lawful *Terry* stop and an unlawful arrest is not bright. *Smith*, 3 F.3d at 1095. "[T]he crux of our inquiry is whether the nature of the restraint imposed meets the Fourth Amendment's standard of objective reasonableness." *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). This is a fact-specific inquiry that takes into account the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.

"Handcuffs are generally recognized as a hallmark of a formal arrest." *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004). Over time, however, the permissible scope of a *Terry* stop has expanded to include the use of handcuffs and temporary detentions in squad cars. *Vega*, 72 F.3d at 515; *Tilmon*, 19 F.3d at 1224–25. Courts have recognized that "requir[ing] an officer to risk his life in order to make an investigatory stop would run contrary to the intent of *Terry v. Ohio*." *Tilmon*, 19 F.3d at 1226 (citing *United States v. Maslanka*, 501 F.2d 208, 213 n. 10 (5th Cir.1974)).

For example, in *Smith*, the Seventh Circuit held that the use of handcuffs did not transform a *Terry* stop into an unlawful arrest. *Smith*, 3 F.3d at 1096. In that case, the defendants were accused of drug crimes and were stopped at 9:40 p.m. *Id.* The officer

handcuffed the defendants because of "safety concerns, considering the time of night, the general environment of the investigation and the nature of the alleged offenses." *Id.*

Based on the undisputed material facts, Officer Redding did have a basis to fear for his safety. Similar to *Smith*, the suspected offense (a shooting) was dangerous and had the potential to pose a threat to the officers or the community. Redding reasonably believed that Barnes was connected to the gunshots based on his high rate of speed, failure to stop at the stop sign, the similarities between Barnes and the information conveyed to Redding by dispatch, and Barnes's confirmation that he was at the scene of the shooting. Although Barnes conveyed to Redding that he was not the shooter, Redding had reason to believe that Barnes was involved in the shooting in some way. At that time, the shooter had not been identified and it was also reasonable for the officers to believe that there could have been multiple shooters given the number of shots reported. Based on the totality of the circumstances, the use of handcuffs by Redding was reasonable and consistent with the permissible purpose and scope of the *Terry* stop. It did not transform the encounter into an arrest.

Even if the seizure was unlawful, qualified immunity would be appropriate because there are no analogous cases that clearly establish that a reasonable officer in Redding's position would understand the conduct to be unlawful. The Seventh Circuit has described the line between a permissible *Terry* stop and an arrest as "dim and wavering." *United States v. Lechuga*, 925 F.2d 1035, 1039 (7th Cir. 1991). On other occasions, the Seventh Circuit has observed that "[f]or better or for worse, the trend [of cases granting greater latitude to employ force during a *Terry* stop] has led to the permitting of

the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention." *Tilmon*, 19 F.3d at 1224–25; *Vega*, 72 F.3d at 515; *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005); *see also Stewart*, 388 F.3d at 1084 ("The permissible scope of a Terry stop has expanded in recent years to include the use of handcuffs and temporary detentions in squad cars.").

There is no precedent making it clear that the use of handcuffs in this scenario would transform the encounter from a stop to an arrest. A reasonable officer could have thought the use of handcuffs was consistent with the permissible purpose and scope of the stop—particularly one involving a firearm. Therefore, even if the use of handcuffs was unconstitutional, it was not clearly established or obvious that Redding violated Barnes's federal rights. Therefore, the officers are entitled to qualified immunity as to Barnes's unlawful arrest claim.

   2. Search

Barnes alleges that the officers violated his constitutional right to be free from unreasonable searches because the search in question: (1) was conducted pursuant to unlawfully obtained consent; (2) exceeded the scope of his consent because he would not have reasonably expected the officers to search his daughter's sealed urn; and (3) the manner in which the search was conducted was unlawful because it was "unreasonable for the officers to cause damage to the urn where they necessarily broke the soldered-sealed cap of the urn in order to access Ta'Naja's ashes." Defendants assert that Barnes consented to the search, and the fact that he was handcuffed does not render the stop to

be coercive. Defendants argue a general consent to search includes searching compartments and containers, and based on his experience, Officer Riebling believed the container could contain narcotics.

### a. Constitutional Violation

It is axiomatic that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One of the exceptions to the warrant requirement is consent because "it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991), (citing *Schneckloth v. Bustamante*, 412 U.S. 117 (1990)).

"[W]here the validity of a search rests on consent," the necessary consent must be "freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497 (1983). Courts have recognized that "[a] person may voluntarily consent to a search even while being legally detained." *United States v. Contreras*, 506 F.3d 1031, 1037 (10th Cir. 2007). But even when there is consent, the scope of the search is not limitless. "[T]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 550 U.S. at 251. Sealed containers are in the general class of effects that are presumptively unreasonable. *United States v. Jacobsen*, 466 U.S. 109, 114 (1984).

However, officers do not need a warrant or consent to search when there is probable cause to search a vehicle. "Probable cause to search a vehicle exists when, based on the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Sands*, 815 F.3d 1057, 1063 (7th Cir. 2015) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Probable cause can develop during a consent search, which could expand the scope of what may be permissibly searched. *See United States v. Garcia*, 897 F.2d 1413, 1419-20 (7th Cir. 1990).

Here, Redding handcuffed Barnes by the time Riebling arrived at the scene. Riebling asked Barnes: "you got no problem if I search?" to which Barnes replied "yeah, go ahead" and told the officers he had "weed" in the vehicle. Barnes argues he felt if he had said "no" Riebling would have searched the car anyway. The record indicates that even though Barnes was handcuffed, there were no threats or promises made by the Officers. Barnes was not physically mistreated, nor is there anything in the record to suggest that his physical or mental condition was diminished. Therefore, Barnes's consent was freely and voluntarily given.

Plaintiff's reliance on *United States v. Strickland*, 902 F.2d 937 (11th Cir. 1990) for the assertion that a search is unreasonable when an officer opens a locked container that is not capable of holding the object of the search, and the opening of the container causes unnecessary infliction of damage, is misplaced. In that case, the individual was stopped for weaving, gave consent to search the car for narcotics, and an irregular spare tire led to the discovery of an automatic weapon and cocaine. *Id*. at 939. The Eleventh Circuit affirmed the district court's denial of a motion to suppress, finding the officers had

probable cause from consent given and the information gained during the search to sustain the validity of a continuation of their search beyond the scope of consent. *Id.* at 943.

In this case, Riebling found bags of cannabis and a scale in the car during the search. The cannabis exceeded the legal amount that a person is allowed to carry for personal use and was not packaged in accordance with Illinois law. At that point, it was reasonable for Riebling to continue the search for other drugs, including enclosed containers. *See Wyoming v. Houghton*, 526 U.S. 295, 301 (1999) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."). Because he had probable cause to search the vehicle, Riebling was permitted to unseal the container. There are no facts in the record to suggest Riebling knew or should have known he was unsealing an urn at the time he searched it. *See United States v. Boden*, 854 F.2d 983, 995 (7th Cir. 1988) ("When an officer has probable cause to believe that contraband exists anywhere in a car, he can search for and seize it."); *United States v. Mazzone*, 782 F.2d 757, 760 (7th Cir. 1986) ("if the police have probable cause to believe that there is contraband or other lawfully seizable material anywhere in the car they can search for it even if it is in a sealed container, or in a closed or even locked compartment such as the glove compartment or the trunk."). Based on the foregoing, the Court finds Riebling had probable cause that did not exceed the scope of the consent given to open the container.

Even if this Court were to find that the search was unconstitutional, qualified immunity would be appropriate because there are no analogous cases that clearly

establish that a reasonable officer in the officers' position would understand the conduct to be unlawful. Qualified immunity shields liability from police officers "who act in ways they reasonably believe to be lawful." *Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987). The defense provides "ample room for mistaken judgments" and protects all but the "plainly incompetent and those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

Here, pursuant to a consensual search, the officers uncovered an illegal amount of suspected cannabis and paraphernalia suggesting an intent to distribute. This gave rise to probable cause supporting a further search. When Riebling found the container in the center console, he did not know that it was an urn. Riebling reasonably thought it looked like small containers he had seen used for transporting narcotics, so he unsealed the container and found a "brown chunky substance," which he believed was heroin. The urn had a keyring for a necklace and depicted a cross surrounded by dragons and a crown over the cross but had no other markings to indicate that it was an urn. There is no precedent to suggest that an officer in a similar situation would not have searched an unmarked container under these circumstances. Accordingly, because the officers made a reasonable mistake, they are entitled to qualified immunity.

### 3. Failure to Intervene

Barnes's final claim pursuant to § 1983 is based on the officers' failure to intervene in both the unlawful seizure and the unlawful search. To find defendants liable, the court must find that a duty to intervene exists and that the officer had an opportunity to intervene. *Doxtator v. O'Brien*, 39 F.4th 852, 864-65 (7th Cir. 2022). There can be no failure

to intervene if a constitutional right has not been violated. *See, e.g., Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation[.]"); *Gossmeyer v. McDonald*, 128 F.3d 481, 494 (7th Cir. 1997) (no constitutional violation and so no liability for failure to intervene). As the party moving for summary judgment, Defendants must "identify[ ] each claim or defense . . . on which summary judgment is sought" and also "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also id.* R. 56(c)(1) *see also Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary" (internal citation omitted)).

Based on the Court's entry of summary judgment in favor of Defendants as to Counts I and II, there is no longer an underlying constitutional violation to support the failure to intervene claim. Thus, the failure to intervene claim is dismissed.

**C. State Law Claims**

In addition to his §1983 claims, Barnes also brings three state law claims: false imprisonment, intentional infliction of emotional distress, and negligent infliction of emotional distress. Having determined that the only claims over which the Court has original jurisdiction will be dismissed, the Court declines to exercise supplemental jurisdiction over any remaining state law claims under 28 U.S.C. § 1367(c)(3). *See Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 300 (7th Cir. 2003) ("With the dismissal of [plaintiff's federal] claim, the sole basis for invoking federal jurisdiction is nonexistent

and the federal courts should not exercise supplemental jurisdiction over his remaining state law claims."); *see also Hagan v. Quinn*, 867 F.3d 816, 830 (7th Cir. 2017) ("The usual practice in this circuit is for district courts to 'dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.'"). Any remaining state law claims are dismissed without prejudice.

V.      CONCLUSION

Defendants' Motion for Summary Judgment is GRANTED. Counts I, II, and III are dismissed with prejudice. Counts IV, V, VI, and VII are dismissed without prejudice. The Clerk will enter Judgment and terminate this case.

ENTER: March 28, 2024

/s/ Colleen R. Lawless
COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE
